**UNITED STATES of America,
Appellee,**

v.

**John Jacob BOBO et al., Appellants.**

**Nos. 71–2077, 71–2078, 71–2079.**

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 3, 1972.

Decided April 23, 1973.

William B. Long, Jr., Greenville, S. C. (Thomas W. Whiteside, Spartanburg, S. C., on brief), for appellant John Jacob Bobo.

Albert Q. Taylor, Jr., Greenville, S. C., for appellant Jack M. Gray.

Klyde Robinson, Charleston, S. C., and Geddes H. Martin, Columbia, S. C., for appellants William Duward McEwen and Paul Goldberg.

Oscar W. Bannister, Jr., Asst. U. S. Atty. (John K. Grisso, U. S. Atty., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, BOREMAN, Senior Circuit Judge, and WIDENER, Circuit Judge.

WIDENER, Circuit Judge:

Appellants Jack M. Gray and John Jacob Bobo were convicted for violation of 18 U.S.C. § 1952 on indictments charging that they used mail telephone facilities and Western Union teletype services in interstate commerce with intent to promote, manage, establish and carry on an unlawful activity, that being a business enterprise involving gambling in violation of the laws of the State of South Carolina.

Appellants Jack M. Gray, John Jacob Bobo, William Duward McEwen and Paul Goldberg were convicted for conspiracy to conduct, finance, manage, supervise, direct or own an illegal gambling business involving five or more persons within the meaning of 18 U.S.C. § 1955. Another defendant, Porter, was convicted for the substantive violation of 18 U.S.C. § 1955. After this appeal was taken, Porter moved for voluntary dismissal of his appeal, which motion was granted. Certain other co-defendants pleaded guilty to these same violations, while other co-defendants pleaded guilty to violations of 18 U.S.C. § 1084. (§ 1084 relates to interstate transmission of wagering information.)

The proper disposition of these appeals lies in the quagmire of facts involved. While the facts surrounding each allegation can best be considered separately, a basic outline is necessary for understanding the contentions raised on appeal.

Appellant Jack Gray was a New York resident, where he occasionally placed small bets with local bookmakers. He was transferred by his employer to Greenville, South Carolina, nine or ten years ago. Unable to locate a South Carolina bookmaker for approximately three years, Gray continued placing bets, through friends, with New York bookmakers. Gray located appellant Porter, with whom he began betting locally, and also Bobo, with whom he began betting in Spartanburg, South Carolina.

Appellant Bobo and his helper, Kirkland, communicated and exchanged bets not only with Gray and his helper, Segan, but also with appellant Porter in Greenville and with appellants McEwen and his helper, Goldberg in Charleston, South Carolina. It should be noted here that all appellants, except Gray, admit to be bookmakers receiving and making bets on athletic contests, in violation of state law, for a time period and in a dollar amount sufficient to meet the specific requirements of 18 U.S.C. § 1955. They do, however, contend that they did not act together so as to constitute a business involving five or more persons, which is also required by the Act. Gray contends that he is a mere bettor with a system and not a bookmaker.

During the period October, 1970 through January, 1971, appellants McEwen and Goldberg, by their own admission, operated, in violation of state law, a bookmaking establishment known as the Uptown Sports Center, 476 King Street, in Charleston, South Carolina. They had so operated for several years and were generally known in Charleston as bookmakers. They normally received bets from their customers, some of whom were bookmakers, and they in turn placed bets with other persons and sometimes those others were bookmakers.

The appellants tried to bet by a system, each with his own refinements. Gray developed a system whereby he could not lose. He might not always win, but he could not lose. Gray noticed that the betting line out of New York and the line out of South Carolina would fluctuate. The line is a point spread between teams in an athletic contest, which is determined by the bookmaker or makers offering the bet. The line might come from New York at, say, New York plus seven points in a game between New York and Dallas. But Gray noticed that up until game time the line would fluctuate in different places, particularly where local prejudices would influence the betting. The variation Gray first observed was the line in New York to be Dallas plus 2½ and the South Carolina line to be New York plus 2. By betting both sides, if the game score differential was zero to four points, he would win both bets. In fact, the game ended 13–13, so Gray did win both bets (commonly called a split bet). Gray realized that he could, by taking advantage of the local variation in the line, increase his chances of winning over that of a bettor merely using a single bookmaker in one area. When Gray located Bobo in *Spartanburg*, he then had access to two or three New York

lines and Bobo's and Porter's lines in South Carolina.

Gray further refined his system by obtaining an additional advantage from a New York bookmaker. If Gray would agree to bet $500 per game on all 13 pro-football games played over the weekend, the New York office would give him a ½ point advantage from the line. By obtaining the same concession from Bobo in South Carolina, he was in a position to bet both sides of a game, with an additional point variation plus any difference already existing in the several lines. Bobo further fit into the scheme as follows: Gray was required to bet $500 on each game being played in order to acquire his concession of ½ point. Gray, like any other bettor, had to pay the vigorish[1] on his losing bets. Gray agreed to pass on wagers from Bobo when the wager sought by Bobo was a wager that Gray could make under his system. Thus, Gray fulfilled his obligation for total number of bets, and since it was Bobo's bet he placed, he eliminated the possibility of losing the 10% vigorish in the event of the loss, and would win both sides if the score fell within the point spread. This also facilitated Bobo's efforts to balance his books prior to the weekly games.

Gray would also take what are called juice bets from appellant Porter. It appeared that Porter's specialty was his superior ability to predict scores based on his knowledge of the teams involved. A juice bet is a bet very likely to win because of information known to the better which, if known to the bookmaker, would change the odds or the bookmaker would not offer the bet at all.

These appellants have raised a total of nine allegations and each appellant states in his brief that he incorporates and adopts any of the legal arguments of the others which might inhere to his benefit. While we do not normally consider it our obligation in a case of multiple appeals to weed out which arguments best fit the various appellants, the consideration of each argument shall, unless otherwise stated, apply to each appellant.

## I

■■ During the course of the investigation and prosecution of this case, the government made extensive use of information gathered by the use of wiretaps. With regard to these wiretaps, the appellants make the following allegations:

1. The provisions of Title III of the Omnibus Crime Control Act of 1968 violate the Fourth Amendment guarantee against unreasonable searches and seizures.

2. There was insufficient showing by the government that "other investigative procedures" would not have been effective as required by 18 U.S.C. § 2518(1)(c).

3. There was insufficient compliance by the government with the mandatory requirements for authorization contained in 18 U.S.C. § 2516(1).

The Fourth Amendment says that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Men may differ, and many courts have differed, as to what is a reasonable search and seizure, but it is beyond question that the Fourth Amendment only prohibits unreasonable searches and seizures. Carroll v. United States, 267

1. In other words, if a player or customer bets one hundred dollars with a bookmaker on a specific athletic contest, he stands to lose the entire $100, but if he wins the bet, he may only win $90. The 10% overage which the bookmaker takes is termed vigorish. A bookmaker thus can win 10% of the total bets placed with him by balancing his books by taking equal amounts of money on the favorite and underdog, using the same line.

U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The Supreme Court has, on numerous occasions, discussed the nature of the right protected by the Fourth Amendment. In Wolf v. Colorado, 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949), the court stated that "The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment— is basic to a free society." Perhaps the clearest statement by the court was in Camara v. Municipal Court, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967): "The basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." Thus, through the explicit language of the Amendment itself and the cases interpreting it, we know that the Fourth Amendment means what it says—unreasonable searches are prohibited. The court has likewise recognized that the requirements of the Fourth Amendment are not inflexible or obtusely unyielding to the legitimate needs of law enforcement. Osborn v. United States, 385 U.S. 323, 330, n. 9, 87 S.Ct. 429, 17 L.Ed.2d 394 (1967); Ohio ex rel. Eaton v. Price, 364 U.S. 263, 80 S.Ct. 1463, 4 L.Ed.2d 1708 (separate opinion) (1963). It is, then, with an eye toward implementing the Fourth Amendment's goal of securing the sanctity of personal privacy and at the same time accommodating the legitimate ends of law enforcement, that we view the challenged provisions of the Omnibus Crime Control Act of 1968 to see if it is constitutionally valid.

■ The subject of electronic surveillance has been before the Supreme Court in several recent cases; so, we are not without guidelines with which to make our determination. In Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L. Ed.2d 1040 (1967), the Supreme Court considered the constitutionality of the New York permissive eavesdrop statute.

N.Y. Code Crim. Proc., § 813–a. Although Berger struck down the New York statute, the court made it clear that electronic surveillance is permissible when judicially authorized under the most precise and discriminating circumstances which meet the requirements of the Fourth Amendment. Berger at 56, 87 S.Ct. 1873; Osborn, supra. In Berger, the court contrasted safeguards present in the Osborn case, in which the court had earlier upheld an authorization for electronic surveillance, and the elements which were lacking in the New York statute which was declared unconstitutional.

■ We read Berger and Katz as enumerating certain safeguards without which an authorization for the interception of wire or oral communications may not be valid: a neutral and detached judicial authority must be interposed between the government and the public; a showing of probable cause that a particular offense has been or is being committed; the communications, conversations, or discussions sought to be intercepted should be described with particularity; the period during which the interception is authorized must be limited so it is not the equivalent of a series of intrusions pursuant to a single showing of probable cause; the order must be promptly executed; extensions or renewals of the order must have separate showings of probable cause; the order must terminate the eavesdropping once the conversation sought is seized; there must be some showing of special facts to excuse the lack of notice occasioned by necessary secrecy; and the order must provide for a prompt return which must be made describing what has been seized.

The court, in Berger, concluded that the statute's blanket grant of permission to eavesdrop was without adequate judicial supervision or protective procedures. In Katz, the failure of the order to provide certain safeguards was held fatal.

In Osborn, probable cause consisted of affidavits of a witness in a federal court

**980**

sought to be bribed by an attorney. The order approved there, and cited with approval in *Berger,* illustrates safeguards which, when effected, will avoid conflict with the Fourth Amendment. The order described the type of conversation sought with particularity; the officer could not search unauthorized areas; once the conversation was intercepted, the officer could not use the order for further search; one limited intrusion was authorized, rather than a series or a continuous surveillance; new order was issued when the officer sought to resume the search and probable cause was shown for the new order; the order was executed by the officer with dispatch; the officer was required to make a return on the order showing how it was executed and how it was seized, and he did so.

The factors listed in *Berger, Katz* and *Osborn* are, of course, important, but we must look, as did the Supreme Court, to the totality of the circumstances and the overall impact of the statute to see if it authorizes indiscriminate and irresponsible use of electronic surveillance or if it authorizes a reasonable search under the Fourth Amendment.

■ The Crime Control Act was by no means ill-advised or hastily conceived legislation. Congress expressed an awareness of the decisions of the Supreme Court in *Osborn, Berger* and *Katz,* and made an effort to comply with the standards which had been enunciated in those cases. Sen.Rep. No. 1097, 90th Cong., 2nd Sess., 1968 U.S.Code Cong. & Admin.News, p. 2112 et seq.; United States v. Cox, 449 F.2d 679, 684 (10th Cir. 1971), cert. den., 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972); United States v. Cox, 462 F.2d 1293, 1303 (8th Cir. 1972). The legislative history shows that the specific requirements for valid legislation were considered. The need for the legislation was the subject of extensive study not only by the Congress but also by the President and many study committees of the

various bar groups. The Presidental Commission found that organized criminals use wire and oral communications and recommended that surveillance of such communications was essential to the effective detection and prosecution of crime. *President's Commission on Law Enforcement and Administration of Justice,* (1967). Of course, the fact that the legislation is necessary and the fact that Congress attempted to comply with the Supreme Court's rulings does not mean that the statute is constitutional, but we properly should give consideration to the care with which the legislation was drawn. The statute's purpose was not only to authorize certain limited electronic surveillance, but also to correct and prevent many of its abuses in the sphere of private as well as criminal investigations. Sen.Rep. No. 1097, 90th Cong., 2nd Sess., 1968 U.S.Code Cong. and Admin.News, p. 2112 et seq. Such abuses were also noted by the Supreme Court in *Berger,* supra, 388 U.S. at 46, 47, 87 S.Ct. 1873.

The basic scheme of the Act is to prohibit all interception of wire and oral communications except as authorized by the Act itself. The provisions of the Act with which we are here concerned, 18 U.S.C. §§ 2515–2520, set out a comprehensive scheme for judicial authorization of interception of oral and wire communications. As previously noted, the issue here is not whether wiretapping is *per se* unconstitutional. It is clear from *Berger, Osborn* and *Katz* that a statute authorizing wiretapping which contains sufficient prior safeguards is constitutionally permissible.

Utilization of the provisions of the Act is commenced by an intercept authorization application which itself must be authorized by the Attorney General or any Assistant Attorney General specially designated by the Attorney General. 18 U.S.C. § 2516(1). The application must be made to a federal judge of competent jurisdiction and it must be made in writing upon oath or affirmation.[2] The

2. The Act also provides for State procedures which follow State enabling legislation not now before the court.

application must contain: (1) the identity of the applicant and the person authorizing the application; (2) a detailed statement of the facts and circumstances relied upon by the applicant to justify his belief that the order should issue. Such statement must set out the particulars of the type of offense being investigated, a particular description of the place where the interception is to be made, a particular description of the type of communications to be intercepted and the identity, if known, of the person committing the offense and whose communications are to be intercepted; (3) a complete statement as to why normal investigative procedures are not being used; (4) a statement of the period for which the interception is required to be maintained;[3] (5) any history of previous authorization applications involving the same persons or places involved in the present application. 18 U.S.C. § 2518. The judge to whom the application is made may refuse to grant the order, require additional information if he so desires, or approve the application. Id. The judge may approve the application only if he determines that there is probable cause to believe that a particular offense is, has been, or is about to be, committed; that there is probable cause for belief that communications concerning the of-

fense will be intercepted; that normal investigative procedures have failed or reasonably appear likely to fail; and that there is probable cause for belief that the place to be tapped is used in connection with the offense, or leased to, listed in the name of, or commonly used by, the person involved in the offense. 18 U.S.C. § 2518(3). If the judge approves the order, he must specify the persons, if known, and places which are subject to the order, the type of communications to be intercepted and the offense to which it relates, the identity of the applicant, the person authorizing it and the agency authorized to execute it, and the period for which it is effective. 18 U.S.C. § 2518(4). The order must terminate the eavesdropping when the objective is attained and may extend in no event longer than thirty days. The order must also direct that it be executed as soon as practicable and that it shall be executed in a manner which minimizes the interception of extraneous matter. 18 U.S.C. § 2518(5). The Act further provides for prompt return by the officer. 18 U.S.C. § 2518(8)(a).[4]

■ We agree with the two circuit courts and over ten district courts which have considered the matter and held that the Act is constitutional.[5] Even a casual reading shows that it does not permit the irresponsible and indiscriminate

---

3. The Act permits orders which do not automatically terminate on a specified date upon a detailed showing of probable cause to believe that the same type of communications will occur thereafter. In no event may the same order run for longer than thirty days.

4. The Act contains other provisions which need not be detailed here, including safekeeping of the recordings, disclosure to the accused at least ten days prior to trial, and reports which must be made by the judge and the investigative agency.

5. United States v. Cox, 449 F.2d 679 (10th Cir. 1971), cert. den., 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972); United States v. Cox, 462 F.2d 1293 (8th Cir. 1972); United States v. Focarile, 340 F.Supp. 1033 (D.C.Md.1972); United States v. LaGorga, 336 F.Supp. 190 (W.D.Pa.1971); United States v.

King, 335 F.Supp. 523 (S.D.Cal.1971); United States v. Becker, 334 F.Supp. 546 (S.D.N.Y.1971); United States v. Lawson, 334 F.Supp. 612 (E.D.Pa.1971); United States v. Perillo, 333 F.Supp. 914 (D.Del.1971); United States v. Leta, 332 F.Supp. 1357 (M.D.Pa.1971); United States v. Scott, 331 F.Supp. 233 (D.D.C. 1971); United States v. Cantor, 328 F. Supp. 561 (E.D.Pa.1971); United States v. Sklaroff, 323 F.Supp. 296 (S.D.Fla. 1971). One district court has held that the Act, because of the discretion given the judge, is unconstitutional because it would conceivably permit a judge to enter an order in contravention of the Fourth Amendment. United States v. Whitaker, 343 F.Supp. 358 (E.D.Pa.1972). See also the dissent to the denial of certiorari in United States v. Cox, 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136.

use of electronic surveillance condemned in *Osborn, Berger* and *Katz.* And, upon close analysis, we are of opinion that the statute successfully meets the fundamental criteria there enunciated. The court, in *Berger,* frowned upon the failure of the New York statute to require belief that any particular offense had been or is being committed and its failure to require showing with particularity the persons, places and types of conversations to be intercepted. The Crime Control Act, as noted above, does not allow such indiscretion. The New York Act had no provision for notice and had no requirement of a showing of exigent circumstances to cure that defect. By contrast, the Crime Control Act requires such a showing. The court, in *Berger,* was quite concerned with the provisions of the New York statute authorizing sixty-day orders upon a single showing of probable cause and extensions thereof merely upon a showing that the extension is in the public interest. The Crime Control Act allows an order, at the most, to be effective for only thirty days; [6] and the safeguards surrounding such order convince us that the thirty-day provision is not of itself a constitutional infirmity. With regard to the maximum period of authorized interception, Sen.Rep. No. 1097, 90th Cong., 2d Sess., April 29, 1968, 1968 U.S.Code Cong. & Admin.News, at p. 2190, provides in pertinent part as follows:

> "Where it is necessary to obtain coverage to only one meeting, the order should not authorize additional surveillance. . . . Where a course of conduct embracing multiple parties extending over a period of time is involved, the order may authorize proportionately longer surveillance but in no event for longer than 30 days, unless extensions are granted. . . . What is important is that the facts in the application on a case-by-case basis justify the period of time of the surveillance."

This congressional intent is expressed in the Act in sections 2518(1)(d), 2518(4)(e) and 2518(5) which provide that the order shall extend only so long as necessary to achieve its objective, with a maximum period of thirty days unless extended. An order which does not automatically terminate upon interception of the communications there described may be granted only upon a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter. The order as issued may only last for a maximum of thirty days unless extended. All extensions of orders must comply with the same requirements as an original order. Thus, while the thirty-day limit may cause some contention, we are of opinion that the Act sufficiently circumscribes the time limit of effectiveness of orders so as to be unobjectionable in a constitutional sense. We are convinced that the Crime Control Act, because of its precise and discriminate requirements and its provision for close judicial supervision, does not violate the Fourth Amendment.

The provisions of the Act relating to emergency authorizations not requiring prior judicial scrutiny are not before us and as to them we express no opinion.

■ The appellants next contend that there was an insufficient showing by the government that "other investigative procedures" would have been ineffective as required by 18 U.S.C. § 2518(1)(c). As previously mentioned, the Crime Control Act provides that an application for an authorization order must contain a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous. If the Crime Control Act could be validly utilized in any investigation, it would seem to be one involving gambling operations using telephone facilities almost exclusively as a means for communications. We also note the finding of the

---

6. Extensions are subject to additional scrutiny not present in the New York Act.

President's Commission concerning the extensive use by criminals of telephone facilities. In this case, the government contends that the affidavit of Roger J. Fontanella, Special Agent of the FBI, sufficiently establishes that normal investigative techniques were not and would not be sufficient. We agree. Fontanella is a gambling investigative expert with five years' experience. His affidavit states, in pertinent part, the following:

"Based upon my knowledge and experience as a Special Agent of the Federal Bureau of Investigation in the investigation of gambling cases and my association with other Special Agents who have conducted investigations of gambling activities, normal investigative procedures reasonably appear to be unlikely to succeed in establishing that Jack M. Gray, John Jacob Bobo, William Duward McEwen, Charles Smith, Paul Goldberg, and others as yet unknown, are involved in gambling activities on the telephone in violation of South Carolina and Federal laws, what is the full extent of the interstate gambling conspiracy, who are involved as co-conspirators, aiders and abettors, and what is the hierarchy of this illegal gambling operation. This is based upon the following:

d. Through my experience and the experience of other Special Agents who have worked on gambling cases, records that have been seized in gambling raids have generally not been sufficient to establish the interstate elements of federal offenses because such records are difficult to interpret and are sometimes in code. Many times these records are of little or no significance without further knowledge of the gambler's activities and the interstate nature of the gambling operation. The confidential informants referred to in this affidavit refuse to testify against the parties named herein because of fear for their personal safety. Physical surveillances on gambling operations heretofore mentioned have failed to furnish substantial information of a federal gambling violation because there is little or no personal contact between these persons. If surveillance is conducted on a regular basis, it would jeopardize the investigation. Furthermore, the utilization of undercover agents would not likely prove a federal violation due to the small number of people who have access to the overall plan or scheme.

e. For the reasons set out hereinabove, all normal avenues of investigation would fail to produce the desired proof, in my opinion. I further believe that the only reasonable way to develop the necessary evidence of violations of Federal statutes relating to gambling by those persons named herein is to intercept wire communications to and from the telephones subscribed to and/or used by individuals previously mentioned.

f. Investigation indicates that the following listed telephone numbers have been used, are being used, and will continue to be used to carry on the business of bookmaking as described above:

Telephones 244–0928 and 244–0966, which are listed to Jack M. Gray, 815 Edwards Road, Apartment 26, Williamsburg Manor, Greenville, South Carolina.

Telephones 583–2505 and 583–9871, which are listed to Thomas D. Steadman, 955 Howard Street, Spartanburg, South Carolina.

Telephones 723–6010 and 723–6420, which are listed to Uptown Sports Center, 476 King Street, Charleston, South Carolina."

In our view, the above affidavit constituted a sufficient basis from which the district court could have, and did, conclude that normal investigative procedures reasonably appeared unlikely to succeed. We find no merit to the contention that §§ 2518(1)(c) and 2518(3)(c) were not complied with.

Appellants further contend that the authorization applications did not comply with § 2516(1) and § 2518 which provide, in part:

§ 2518

"(1) . . . Each application shall include the following information:

(a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application; . . .

(4) Each order authorizing or approving the interception of any wire or oral communication shall specify

. . .

(d) the identity of the agency authorized to intercept the communications, and of the person authorizing the application;[7]

The application for the wiretap authorization order in this case took the following course: On December 2, 1970, the director of the FBI made a request for authorization to apply for an order. The request was reviewed by the Criminal Division of the Department of Justice and forwarded to the Attorney General with the recommendation that it be approved. Sol Lindenbaum, the Attorney General's Executive Assistant reviewed the request and likewise recommended approval. Attorney General John N. Mitchell approved the request for authority to apply for the interception order by personally initialing a memorandum addressed to Assistant Attorney General Will Wilson, which stated, in part:

"This is with regard to your recommendation that authorization be given to Joseph O. Rogers, Jr., United States Attorney, District of South Carolina, to make application. . . . "Pursuant to the powers conferred on me by Section 2516 of Title 18, United States Code, you are hereby specially designated to exercise those powers for the purpose of authorizing Joseph O. Rogers, Jr., to make the above described application."

Based upon the Attorney General's approval, the Criminal Division sent a letter, dated December 3, 1970, to the United States Attorney for South Carolina. The letter was actually signed by Deputy Assistant Attorney General Henry Peterson, who was authorized to, and did, sign Will Wilson's name. It appears that Peterson had been authorized to sign Wilson's name to letters of authorization for applications for wiretap orders after such applications had been approved by the Attorney General. Only Peterson and one other assistant were so authorized. This is not a case of indiscriminate signing of authorizations. The Attorney General had personally approved the order in question. Any authorization letter bearing Will Wilson's name could only have been signed by one of two persons. Thus, responsibility for the application's approval or denial can be fixed at any stage of its transmittal.

This court only recently had occasion to address the issue of compliance with the authorization provisions of the wiretap act. In United States v. Giordano, 469 F.2d 522 (4th Cir. 1972), we held that where neither the Attorney General nor the Assistant Attorney General had actually authorized the applications the provisions of the Act had not been complied with. In *Giordano*, "neither Mitchell nor Wilson had heard of the Giordano application or signed the letters bearing their respective initials and signature." *Giordano*, at p. 524. The opinion further stated:

"Most other courts (citations omitted) have followed another approach in deciding the issue of compliance with §§ 2518(1)(a) and 2518(4)(d). These courts have said that once the Government has proved that Mitchell properly authorized the initial application, the fact that the Judge might have been told that Will Wilson rather than Mitchell was the source of the authorization was a matter of form, not

---

7. No objection is made to any formal aspect of the application or order other than as discussed below.

substance. But here, there was no proper authorization at all. Neither Mitchell nor Will Wilson—nor any Assistant Attorney General for that matter—authorized the Giordano wiretap application.

"Perhaps it can plausibly be argued that when an application is properly authorized and only the identity of the source is mistakenly transmitted to the judge, he would have authorized the wiretap had he known the real facts. But where in the first place there is no proper authorization, this argument is unavailable." *Giordano* at p. 530.

In this case, unlike *Giordano*, the Attorney General personally initialed a memorandum approving the specific wiretap authorization here questioned. The fact that Mitchell himself had approved the request was made known to the judge to whom the application was made. (Appendix, Vol. I, Sec. IB.) As previously mentioned, the authorization which finally left the Attorney General's office bore the name of Will Wilson. Wilson, however, did not sign his name; it was placed there by Peterson, one of the two men who were authorized to sign for Wilson in the event Mitchell personally approved the wiretap authorization. We are of opinion that where, as here, a Deputy Assistant Attorney General, specifically authorized, signs the Assistant Attorney General's name, and the Attorney General specifically authorizes the application, there has been sufficient compliance with §§ 2516 and 2518 of the Act. See also United States v. Cox, supra; United States v. Becker, 461 F.2d 230 (2nd Cir. 1972).

Accordingly, we reject appellants' contentions relating to the wiretaps in this case.

## II

Appellants contend that the district court should have dismissed Count I as being an unindictable conspiracy. Count I charges a conspiracy to violate 18 U.S.C. § 1955 which makes it a violation to conduct, finance, manage, supervise, direct or own all or part of an illegal gambling business. To be in violation of the Act, the gambling business must, among other things, involve five or more persons. There is no special significance to the number five other than representing a policy decision by Congress to exclude small operations from the coverage of the statute. The gist of appellants' argument is that the indictment, in effect, charges a conspiracy to conspire. To support their allegation, appellants cite a common law principle known as the Wharton rule. The essence of the rule follows:

"When to the idea of an offense plurality of agents is logically necessary, conspiracy, which assumes the voluntary accession of a person to a crime of such a nature that it is aggravated by a plurality of agents can not be maintained." 2 Wharton, Criminal Law, § 1604, at 1862 (12th Ed. 1932).

The rule has been discussed by the Supreme Court, e. g., Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), and various circuit courts, including the Fourth Circuit. Lisansky et al. v. United States, 31 F.2d 846 (4th Cir. 1929); Curtis v. United States, 67 F.2d 943 (10th Cir. 1933). The cases [8] decided on the issue of what

8. Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); United States v. Katz, 271 U.S. 354, 46 S.Ct. 513, 70 L.Ed. 986 (1926); Gebardi v. United States, 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206 (1932); United States v. Benter, 457 F.2d 1174 (2nd Cir. 1972); United States v. Becker, 461 F.2d 230 (2nd Cir. 1972); United States v. Smolin, 182 F.2d 782 (2nd Cir. 1950); United States v. Sager, 49 F.2d 725 (2nd Cir. 1931); Old Monastery Co. v. United States, 147 F.2d 905 (4th Cir. 1945); Lisansky v. United States, 31 F.2d 846 (4th Cir. 1929); Chadwick v. United States, 141 F. 225 (6th Cir. 1905); United States v. New York Central & R. R. Co., 146 F. 298 (Cir.Ct.S.D.N.Y 1906); United States v. Dietrich, 126 F. 659 (Cir.Ct.D.Neb.1904); Thomas v. United States, 156 F. 897 (8th Cir. 1907); United States v. Greenberg, 334 F.Supp.

constitutes an unindictable conspiracy reveal that Wharton's rule, rather than being a rule, is a concept, the confines of which have been delineated in widely diverse fashion by the courts. Practically the only point of agreement among the cases which have considered the issue is the validity of the rule as applied to the crimes listed by Wharton in enunciating the rule. Those were: dueling, bigamy, incest and adultery. The boundaries of the rule have been narrowly drawn in this circuit. In Lisansky v. United States, 31 F.2d 846 (4th Cir. 1929), the opinion reads as follows: (quoting 5 R.C.L. 1072)

> "The principle is confined within very narrow limits. It applies where the immediate effect of the act in view, which is the gist of the offense, reaches only the participants therein; and is in such close connection with a major wrong as to be inseparable from it. * * * It is only where the concurrence to commit an offense and the consummated act are so connected that they really constitute one act, every element inculpatory of each party, so that the separation of the whole into its constituent elements and a prosecution for each as a distinct offense would place the parties twice in jeopardy, that the rule applies."

■ Before proceeding further, we should note the presence of notions of double jeopardy and merger in the quote from Judge Parker's opinion. Under the early common law, a conspiracy was said to merge with the completed felony which was its object and it was improper to separate the offenses for the purpose of prosecution. It is now, however, settled in the federal courts that prosecution for conspiracy, as well as for the commission of the substantive offense, is permissible, offending neither the principles of merger nor double jeopardy. Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489

(1946); Callanan v. United States, 364 U.S. 587, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961). According to the Supreme Court, "the common law rule that the substantive offense, if a felony, was merged in the conspiracy, has little vitality in this country." Pinkerton, supra, 328 U.S. at 643, 66 S.Ct. at 1182. Thus, to the extent that Wharton's rule was or is founded upon the concepts of double jeopardy or merger, it must be viewed as having no validity.

This circuit's enunciation of the rule was further limited in Old Monastery Co. v. United States, 147 F.2d 905 (4th Cir. 1945):

> "Usually the principle is applied to situations in which the concurrence (or agreement) and the substantive crime (or consummated offense) are so intimately and so closely connected that they in reality constitute a single act. Adultery is frequently cited as probably the clearest of such cases. But, as Circuit Judge Parker pointed out, this principle is to be confined to very narrow limits.
>
> .    .    .    .    .    .
>
> "When, therefore, as in the instant case, the conspiracy embraces not merely the necessary parties to the illegal sale, the seller and the buyer, but other conspirators as well, we think that Monastery's altogether technical contention is of no avail. In Clark & Marshall, supra, the rule is thus stated: 'If, however, the contemplated crime be one of which concert or consent is a constituent part, such as fornication, adultery, bigamy, incest and the like, the *mere agreement or accord of the parties to the offense* cannot be so separated from the offense itself as to support an indictment for conspiracy.' [Italics ours.] Then, in a footnote to this statement, it is said: 'But the implication of a third person will make it a conspiracy. .    .    .'"

1092 (D.Ohio, W.D.1971); United States v. Mainello, 345 F.Supp. 863 (E.D.N.Y. 1972); United States v. Iannelli, 339

F.Supp. 171 (W.D.Pa.1972); United States v. Figueredo, 350 F.Supp. 1031 (M.D.Fla., 1972).

In *Pinkerton,* supra, the Supreme Court commented on the Wharton rule as follows:

> "There are, of course, instances where a conspiracy charge may not be added to the substantive charge. One is where the agreement of two persons is necessary for the completion of the substantive crime and there is no ingredient in the conspiracy which is not present in the completed crime. [Citations omitted] But those exceptions are of a limited character."

■ We are of opinion that the following elements must coexist or else the rule may not apply: the immediate effect of the act in view, which is the gist of the substantive offense, reaches only the participants therein; the agreement of the participants is necessary for the completion of the substantive offense; and the conspiracy must be in such close connection with the substantive offense as to be inseparable from it.

■ Remembering that the assignment of error is that the conspiracy charged is an unindictable offense, we then apply the principles just above stated to the indictment here in question. A violation of § 1955 necessarily affects the great number of persons who place bets with the gambling business involved and with whom the gambling business involved places bets. Many persons may be reached in the immediate effect other than the participants in either the gambling business or the conspiracy. A gambling business, the operation of which is made unlawful by § 1955, may be operated without the agreement of the minimum of five persons involved. The five persons need make no agreement; all they need to be is involved. The conspiracy charged here is not in such close connection with the operation of the gambling business as to be inseparable from it. Two persons, for example, could conspire to manage, conduct, finance, etc., an unlawful gambling operation as defined in the statute. Such persons indicted for conspiracy might very well be separate and apart from the five or more persons involved in the gambling business itself.

We are accordingly of opinion that the Wharton rule is not applicable to the indictment in this case. Accord United States v. Benter, 457 F.2d 1174 (2nd Cir. 1972); United States v. Becker, 461 F.2d 230 (2nd Cir. 1972); United States v. Mainello, 345 F.Supp. 863 (E.D.N.Y. 1972); contra, United States v. Greenberg, 334 F.Supp. 1092 (D.Ohio, W.D. 1971); United States v. Figueredo, 350 F.Supp. 1031 (M.D.Fla., 1972).

### III

■ Appellants contend that the trial court erred in charging that six defendants had pleaded guilty. The pertinent part of the charge is:

> "Six of the defendants . . . as you have previously been advised have entered pleas of guilt to various violations of certain federal gambling laws, and are not on trial in this case. "The five remaining defendants . . . are on trial; and it will become ultimately your duty to determine the respective defendants on trial guilt or innocence as to the specific charges remaining in the indictment on which they stand indicted. Not all of the defendants are charged in the two remaining counts.
>
> "The fact that some defendants have seen fit to enter pleas of guilt gives rise to no inference of any defendants' guilt who now stands on trial, and does not relieve the government in any wise of its burden under the law of proving the guilt of each individual defendant as charged in the specific counts that will be submitted to you, of proving the guilt of an individual defendant from the evidence in the case and beyond a reasonable doubt."

The government had indicted eleven persons under Count I, yet only five were on trial. The government explains that more were indicted to be sure they met the five or more requirement of 18 U.S. C. § 1955. It was not unreasonable for the court to explain the posture of the

case as it stood before the jury and explain who was on trial and who was not. In view of the limiting instruction which was given, we do not think the action of the trial court was so improper as to require reversal. We also note that the trial court, without objection, at the beginning of the trial, had given the jury a preliminary charge in similar language. The unexplained deferral of the defense objection until the end of the trial does not add to its weight.

## IV

■ Appellants have lodged objections to those portions of the charge regarding the elements of the substantive offense contained in 18 U.S.C. § 1955. We note at the outset that the statute contains its own definition of "illegal gambling business" and the court charged the jury at least twice in the exact language of the statute. He further charged the jury that the word business should be given its normal customary meaning. The act itself defines illegal gambling business as a gambling business which, among other things not pertinent here, "involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business." In spite of the fact that the statute limits itself to cases involving five or more persons and the court so instructed the jury, appellants contend that the language of the charge was so broad that the jury may have believed that they could convict even if each defendant were in business only for and by himself. We do not think any reading of the instructions would support the construction urged by appellants. Even beyond the language of the statute, the court told the jury that a business enterprise usually involves a continuing course of conduct; that persons could be in business *together* even though they did not work under the same roof; and that defendants may conduct their activities at great distances from each other and still be part of an *overall organization*, that *organization* being a business directed toward some business or end. The judge further charged: "Consider whether the defendants had a *common purpose in their dealing with each other. . . .*" [Emphasis added.] We think the trial court more than adequately conveyed the idea to the jury that the government had to establish a single business rather than merely a number of unrelated individual businesses.

■ All appellants, except Gray, contend that appellant Gray's request number sixteen should have been granted. Gray's request recites the statutory language (which was charged on numerous occasions), except the request used "and" instead of "or," requests separate definitions of certain words, and requests the jury be charged the words be given their "plain and ordinary" meaning. The judge, as above mentioned, told the jury to give the term business its normal customary meaning, so that part of Gray's charge number sixteen was substantially given. If the substance of a requested charge is given, the refusal to use the very words is not error. United States v. Johnson, 337 F. 2d 180 (4th Cir. 1964), aff'd, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681. The trial judge defined the word "conducts" in the words of House Report No. 91–1549, 1970 U.S.Code and Congressional Admin. News Service, 91st Cong., 2nd Sess., Vol. 2, p. 4029. He declined to define the words "finance," "manage," "supervise," "direct," or "own" in the very restrictive definitions sought by appellants. Instead of offering definitions of such words in their "plain and ordinary" meanings, appellants offered instruction substituted into, and grafted onto, *Webster's* definitions, until, other than "own," the "plain and ordinary" meaning of the words was submerged in argument. "Own" is such a common word that no definition is required. In addition, charge sixteen sought to charge the jury the above descriptive words must have existed in the conjunctive before a finding of guilt could result, while the statute uses the disjunc-

tive "or." So, the charge as offered was quite properly refused in any event.

The only other objection to the charge of any consequence is that the trial court, at one point in the charge, used the word "participate." Appellants object to only one use of the word in a forty-four page charge. The court used the word in the following context:

"Next the government would have to establish that five or more persons participated in such business knowingly, willfully, and intentionally performing acts and causing to be performed acts either to conduct, finance, manage, supervise, direct, and control all or part of said business."

Appellants' objection stems from the fact that Congress deleted the word "participate" from the original wording of the statute. The legislative history shows that the language was deleted because the word "participate" might be construed so as to include mere bettors in making up the statutory five persons required for a conviction under the Act. The language "involves five or more persons who conduct, finance, manage, supervise, direct or own all or part of such business," was used instead of "participate." See Hearings, Subcommittee No. 5, Committee on the Judiciary, House of Representatives, 91st Cong., 2nd Sess., Ser. No. 27, p. 191. Taken in the context in which it was used, the word "participate" in the charge is unobjectionable. The judge did not use it in lieu of the statutory language, but in addition to it. One who conducts, finances, manages, supervises, directs or owns certainly participates. The use of the word in the charge was not as an element of the crime but by way of explanation of the elements which must be proved. And the court listed all of the elements in the statute. The trial judge had made it clear on numerous occasions what was required for a conviction and specifically charged twice that a mere bettor would not suffice. We are of opinion that the court's use of the word "participate"

was quite proper in that its use in conjunction with the statutory elements of the crime was by way of explanation and in fact was a further restriction on the criminal liability of defendants. Accordingly, we find no merit to this contention.

### V

The sufficiency of the evidence is also challenged. McEwen, Goldberg and Bobo contend that the evidence was insufficient to sustain a jury finding that there was an illegal gambling business involving five or more persons. Bobo contends that he ran a business separate and apart from Gray, who was the one who actually used interstate telephone facilities, and that he had no knowledge that Gray was using such facilities.

With regard to both of these allegations, it is well to note that the standard for appellate review of the sufficiency of the evidence is that a guilty verdict "must be sustained if there is substantial evidence, taking the view most favorable to the government, to support the findings of guilt." United States v. Sherman, 421 F.2d 198, 199 (4th Cir. 1970). It is also well settled that circumstantial "evidence may support a verdict of guilty, even though it does not exclude every reasonable hypothesis consistent with innocence." United States v. Gilmore, (4th Cir. No. 72–1529, Aug. 28, 1972).

With regard to the first contention, we note that illegal organizations must be, by their very nature, clandestine. They do not file articles of incorporation, execute partnership agreements or provide written contracts for the perusal of government agents. Proof of their existence necessarily involves, to a great extent, the utilization of circumstantial evidence. Appellants' theory is that only one inference may be drawn from the facts, that being that the bookmakers in this case ran strictly individual businesses and that the cooperation between them was not enough to come under the statute. The jury, how-

ever, chose not to accept such theory, and the issue here is whether there is evidence to support the theory accepted. The government contended that the seemingly independent operations had, in effect, joined together in an overall business, the purpose of which was to enhance individual profits, share the individual risks and eliminate competition in certain respects. A review of the extensive record in this case convinces us that there is substantial evidence to support a finding of guilt consistent with the government's theory. The basic operation of the bookmaking schemes in this case was explained in the initial factual statement of this opinion. The evidence established beyond question that the defendants maintained constant communications between themselves, laying off [9] bets with one another to balance their books on an almost day to day basis. They also exchanged line information regularly. By using the same line, they could prevent outsiders from playing them against each other, which was what they were frequently doing to other bookmakers. Without Bobo in Spartanburg and Porter in Greenville, Gray could not have developed his system which required access to at least two lines in different locations. Bobo, in turn, laid off bets with Gray. They all laid off bets with each other in order to achieve the goal of balanced books essential to a bookmaking system without risk of loss. Moreover, the government's proof did not show only isolated incidents and contacts; the evidence showed a regular, consistent course of conduct. We believe the evidence, viewed as it must be at this stage of the proceedings, amply supports the government's theory that appellants' mutually advantageous association constituted an illegal gambling business within the meaning of 18 U.S.C. § 1955.

■ With regard to Bobo's contention that the evidence is insufficient to support his conviction of violation of 18 U.S.C. § 1952, we likewise affirm the jury's guilty verdict. Bobo argues that Gray was the one who actually used interstate telephone facilities. The facts set out in the first part of this opinion and immediately above show that the closest connection in this case was between Gray and Bobo. The evidence is overwhelming that they were working together. After enjoying the fruits of Gray's labor over interstate telephone lines, Bobo cannot be heard now to eschew the burdens. It is inconceivable that Bobo could not have known that Gray was making interstate calls. On at least six occasions, Gray and Bobo discussed the "man up there," what Gray was getting from "up the road," and many times the calls to Bobo would be just after or just before a call to the "man" or "up there" and the parties would mention the call. True, the man "up there" could have been in South Carolina, but in view of Gray's association with New York bookmakers, we find the jury's conclusion beyond challenge at this point. In our view, the evidence is sufficient to support the verdict of guilty.

### VI

Gray contends that he is a mere bettor with a system and not a bookmaker. That the jury's verdict that Gray was not a mere bettor should not be set aside has been previously discussed, and nothing would be added by further exploration of that point.

### VII

Lastly, Gray contends that he was denied a fair and impartial trial on account of the tactics of the government during the trial in the prosecution of the case; that a tape recording which was seized during a gambling raid was improperly introduced into evidence; and that the United States Attorney improperly interjected a personal opinion into his closing argument.

9. When a betting person has more money bet on a participant than he wishes, he transfers all or a part of the bet to someone else. This is called laying off.

We are of opinion that the tape recording was properly identified as having been made during the period of the conspiracy and was properly introduced into evidence. It was found in Gray's home. See United States v. Fuller, 441 F.2d 755 (4th Cir. 1971). The opinion of the United States Attorney expressed in argument, which should be avoided, was no more than stating a contention. While we do not believe it was improper in the context in which it was used, if improper, it was not so prejudicial as to require reversal, particularly in the absence of either timely objection or motion for mistrial. United States v. Browning, 390 F.2d 511 (4th Cir. 1968).

The United States Attorney vigorously and skillfully prosecuted the case, as was his obligation, but his tactics were not unfair. We note the case was also vigorously defended.

We have considered all the various points raised on appeal and are of opinion they are without merit. The convictions are

Affirmed.