469 F.2d 522
 UNITED STATES of America, Appellant,
v.
Dominic Nicholas GIORDANO, also known as Nick Gino, also
known as P. Burdi, also known as Nick Giordina, Appellee.
UNITED STATES of America, Appellant,
v.
Dominic Nicholas GIORDANO, a/k/a Nick Gino, a/k/a P. Burdi,
a/k/a Nick Giordina, et al., Appellees.
 Nos. 72-1399, 72-1407.
 United States Court of Appeals,
Fourth Circuit.
 Argued Sept. 13, 1972.
Decided Oct. 31, 1972.
 
 Francis S. Brocato, Asst. U. S. Atty. (George Beall, U. S. Atty., on brief), for United States.
 John A. Shorter, Jr., Washington, D. C. (Court-appointed counsel), for appellee, Sampson Williams.
 H. Russell Smouse, Baltimore, Md. (Court-appointed counsel), for appellee, Dominic Nicholas Giordano.
 Arthur G. Murphy, Sr., Baltimore, Md. (Court-appointed counsel), on brief for Herman Lee Pettiford, and Phillip M. Sutley.
 Before SOBELOFF, Senior Circuit Judge, and WINTER and BUTZNER, Circuit Judges.
 SOBELOFF, Senior Circuit Judge:
 
 
 1
 Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U. S.C. Sec. 2510 et seq. ["Act"], lays down a stringent step-by-step procedure that circumscribes and limits all electronic surveillance. The scheme was intended to allay the profound concern expressed by the Supreme Court in such cases as Berger v. New York, 388 U.S. 41, 87 S. Ct. 1873, 18 L.Ed.2d 1040 (1967), over electronic intrusions into privacy. Speaking for the Court, Mr. Justice Clark had observed that "Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices." Id. at 63, 87 S.Ct. at 1885. Accordingly, Title III conformed its prescribed procedures in seeking leave to engage in electronic surveillance to the constitutional standards elucidated in Berger v. New York, supra, and Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The question raised here is the extent to which the Government must adhere to the letter of that statutory scheme in authorizing applications and obtaining orders permitting the interception of wire communications.
 
 
 2
 * On October 16, 1970, Francis S. Brocato, an assistant United States Attorney, presented to Chief Judge Edward S. Northrop of the United States District Court for the District of Maryland an application[1] for authorization to intercept wire communications to and from a telephone listed in the name of Nicholas Giordano. To one uninitiated in the "Alice in Wonderland" world of Justice Department wiretap applications, the documentation[2] presented to Judge Northrop-the Brocato affidavit and the purported Will Wilson letter-would indicate that the then Attorney General, John N. Mitchell, had specially designated Assistant Attorney General Will Wilson to authorize the Giordano wiretap; and that Wilson had reviewed the "facts and circumstances" and determined that there existed sufficient probable cause to justify the surveillance. The recitals in the Brocato affidavit and the Will Wilson letter were tailored to fit within the statute's terms. In fact, however, neither Mitchell nor Wilson had heard of the Giordano application or signed the letters bearing their respective initials and signature.[3] The Government itself now concedes that the assertions in the affidavit and letter misrepresented the truth.
 
 
 3
 Acting upon the application and what appeared in the accompanying papers, Chief Judge Northrop authorized the wiretap "pursuant to application authorized by * * * Will Wilson, who has been specially designated in this proceeding by * * * John N. Mitchell, to exercise the powers conferred on him by Section 2516 of Title 18 * * *." The order was extended on October 22 and November 6, and then voluntarily terminated by the Government on November 18 when Giordano and others were arrested and charged with narcotic violations. The defendants filed motions claiming that the Government's application for the October 16 order was fatally defective in that it had not been properly authorized. They therefore demanded the suppression of the contents of any intercepted telephone communications and derivative evidence. The motions were referred to District Judge James R. Miller, Jr., who, after lengthy hearings, ordered suppression and filed a detailed memorandum opinion explaining his reasons. 340 F.Supp. 1033 (D. Md.1972). The Government here appeals from Judge Miller's order.[4]
 
 
 4
 The fundamental issue to be resolved is whether the Giordano wiretap was properly authorized as required by 18 U.S.C. Sec. 2516(1), which reads:
 
 
 5
 The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications * * *.
 
 
 6
 The defendants contend that the Government has failed to comply with the requirements of this section because the source of the requisite wiretap authorization was not the then Attorney General John N. Mitchell, but his executive assistant, Sol Lindenbaum. The Government concedes that Mr. Lindenbaum not only authored the memorandum of approval, but also penned thereon the Attorney General's initials ("JNM").
 
 II
 
 7
 The procedures followed in the instant case, as outlined by the Government in affidavits submitted to Judge Miller, included a request for authorization by the Director of the Bureau of Narcotics, and subsequent review and favorable recommendation of this application by the Deputy Chief and Chief of the Organized Crime and Racketeering Section of the Department of Justice and the Deputy Assistant Attorney General. Since Attorney General Mitchell had not designated an Assistant Attorney General to authorize without his approval the filing of wiretap applications, the application was referred to him for his consideration and approval. In accordance with office procedure, Sol Lindenbaum, Mr. Mitchell's executive assistant, reviewed the case in order to make recommendations to the Attorney General. The request for approval in this case came in while Mitchell was away from Washington. According to Lindenbaum's affidavit furnished to Judge Miller, Lindenbaum reviewed the application in the Attorney General's absence and concluded from his knowledge of the Attorney General's previous actions that Mitchell would sign. The Government's brief then alleges that "pursuant to authorization given to [Lindenbaum] by the Attorney General to act 'in the circumstances,"' Mr. Lindenbaum approved the request and signed Mitchell's initials on a memorandum directing that application be made to set up a wiretap on Giordano's phone.
 
 
 8
 Despite the fact that neither the Attorney General nor any Assistant Attorney General authorized the application, the Government contends that the application was properly authorized and that the spirit, if not the letter, of 2516(1) was observed. The Government's argument may be described as an "alter ego theory." The contention is that Lindenbaum should be treated as Mitchell's alter ego with respect to wiretap applications at times when the Attorney General was unavailable. The Government maintains that while the Attorney General granted to his trusted confidant in the Title III area permission to authorize applications in his absence, the Attorney General, nevertheless, did not delegate the responsibility for the action. Since the Attorney General retained responsibility for the authorization, the argument continues, the primary legislative purpose of 2516(1)-that a line of responsibility lead to a clearly identifiable person-is met. In urging this theory upon the court, the Government stresses the increase in recent years in the number of applications for wiretaps and the impossibility of one man personally exercising all the statutory functions of an office such as the Attorney Generalship.
 
 III
 
 9
 The argument that Mr. Lindenbaum's approval of the application for permission to wiretap fulfills the statutory requirements of Section 2516 must fail.
 
 A. Legislative History
 
 10
 The legislative history of Section 2516, while not determinative, is indeed enlightening. Prior to 1968, wiretapping and eavesdropping legislation had been introduced in several sessions of Congress. Especially illuminating is a review of S. 1495 presented in the 87th Congress, 1st Session, in 1961. Section 4(b) of this bill, as originally proposed, provided that:
 
 
 11
 The Attorney General or and officer of the Department of Justice or any United States attorney specially designated by the Attorney General, may authorize any investigative law enforcement officer of the United States or any Federal agency to apply to a judge of competent jurisdiction for leave to intercept wire communications * * *.
 
 
 12
 On June 21, 1961, the Department of Justice submitted to Congress a proposed revision of S. 1495 which, for the first time, included precisely the same operative language as the present Sec. 2516(1) of Title 18, United States Code. The Department of Justice proposed to modify Sec. 4(b) of S. 1495 to read as follows:
 
 
 13
 The Attorney General, or any Assistant Attorney General of the Department of Justice specially designated by the Attorney General, may authorize an application to a judge of competent jurisdiction * * *. Hearings Before the Subcommittee on Constitutional Rights of the Committee on the Judiciary, Wiretapping and Eavesdropping Legislation, 87th Congress, First Session (May 9, 10, 11, 12, 1969) at 372.
 
 
 14
 The Justice Department's revision of the wording of Section 4(b) of S. 1495 followed the testimony of Herbert J. Miller, Jr., Assistant Attorney General, Criminal Division of the Department of Justice, at hearings on the bill in May, 1961. He testified that the Department felt that the authorization provision in S. 1495 was too broad and suggested that the range of officials who might authorize wiretaps be sharply curtailed-limited to the Attorney General and Assistant Attorneys General specifically designated for the purpose. The motivation for this change was to "give greater assurance of a responsible executive determination of the need and justifiability of each interception." Confining the authority to authorize wiretap applications to a carefully delineated high echelon of officials within the Justice Department was apparently considered the means to accomplish this end. The pertinent testimony of Miller in this regard bears repeating:
 
 
 15
 This is the approach of S. 1495, with which the Department of Justice is in general agreement. The bill makes wiretapping a crime unless specifically authorized by a Federal judge in situations involving specified crimes. As I understand the bill, the application for a court order could be made only by the authority of the Attorney General or an officer of the Department of Justice or U. S. Attorney authorized by him. I suggest that the bill should confine the power to authorize an application for a court order to the Attorney General and any Assistant Attorney General whom he may designate. This would give greater assurance of a responsible executive determination of the need and justifiability of each interception. Id. at 356. (Emphasis added.)
 
 
 16
 The language of the Justice Department recommendation was incorporated verbatim in all subsequent proposals and became part of S. 917 which contained the text of Title III as it was eventually enacted by the Congress. The Senate Report, in referring to Sec. 2516(1) further reveals the concern of Congress in limiting the individuals who might authorize wiretap applications. It states:
 
 
 17
 Paragraph (1) provides that the Attorney General, or any Assistant Attorney General of the Department of Justice specifically designated by him, may authorize an application for an order authorizing the interception of wire or oral communications. This provision centralizes in a publicly responsible official subject to the political process the formulation of law enforcement policy on the use of electronic surveillance techniques. Centralization will avoid the possibility that divergent practices might develop. Should abuses occur, the lines of responsibility lead to an identifiable person. This provision in itself should go a long way toward guaranteeing that no abuses will happen. (Emphasis supplied.) 1968 U.S.Code Congr. & Adm. News, p. 2185.
 
 
 18
 The passage conveys the congressional intention to limit the initiation of wiretap applications to "a publicly responsible official subject to the political process." While the Attorney General and his nine assistants are subject to the "political process" in that they must be approved by the Senate, the executive assistant to the Attorney General need not secure confirmation. He is appointed by and serves at the will of the Attorney General.
 
 
 19
 Because of the delicate nature of the power to initiate electronic surveillance applications, the implementation was reserved to designated officials of a certain rank within the Justice Department. It does not matter whether Mr. Lindenbaum is a man of integrity; he is not an official who has been subjected to the "political process"-Senate confirmation. His approval of a wiretap authorization does not fulfill the congressional mandate. Additionally the alter ego theory is open-ended. It need not stop with Lindenbaum, but could be extended with an equal claim of validity to anyone within or without the Department of Justice. In determining who qualifies as an alter ego, it would permit sidestepping the congressional mandate fixing the level of those who may be designated to authorize applications.
 
 B. Executive Legislation
 
 20
 The Government spins its argument in an attempt to justify what has been done, but the procedure that was followed does violence to the congressional design. It is argued that this does not matter, since the safeguards of the statute are effectively paralleled in the practice followed by the Justice Department. This is tantamount to arguing that the clearly expressed congressional will may be set aside in favor of an alternative scheme which in the eyes of the administrators is just as good or better. Such legislation by the Executive Department violates the separation of powers doctrine and is not to be tolerated.
 
 
 21
 The Government buttresses its argument by citing the phalanx of enforcement agents who joined in recommending the application for a wiretap. On closer scrutiny this is seen to be just another attempt to justify substituting legislation by the Executive in place of that enacted by Congress.
 
 
 22
 The language of the statute repels any suggestion that the Congress meant to sanction an alternative procedure that might be deemed acceptable by the Justice Department. Could the congressional purpose to tighten the law and rigidly confine authorizations to seek wiretaps be expressed more plainly? The statutory terms evidence a firm intention to strengthen and not to weaken the expressed restrictions. We perceive no warrant for the interpretation urged upon us by the Government.
 
 C. Identifiable Responsibility
 
 23
 Congress also sought to centralize the decision-making proces in the area of electronic surveillance to effectuate a unitary policy and, even more importantly, to establish a clear line of responsibility. By making an official subject to the "political process" publicly responsible for each and every wiretap, Congress sought to provide the individual with yet another safeguard to insure that the awesome power of electronic surveillance be exercised with circumspection.
 
 
 24
 The Government argues that Attorney General Mitchell created departmental policy which Lindenbaum faithfully carried out. It is further called to our attention that Mitchell, since the question of the lawfulness of Lindenbaum's procedure in authorizing wiretap applications has achieved public attention, has accepted responsibility for the Giordano and other wiretaps. Congressional policy is once more said to have been fulfilled by alternative means.
 
 
 25
 These contentions again miss the mark for they are based on untenable assumptions. The premise is that future alter egos will always act within guidelines created by the Attorney General and that future Attorneys General will then always acknowledge responsibility for authorizations penned in their names. Our concern here is not primarily with past action of a former Attorney General, but rather the future consequence of sanctioning an alternative scheme which could be abused hereafter to evade the congressional policy of locating responsibility for wiretap applications with the Attorney General and a limited number of his designated assistants. If we should accept the Government's reasoning, there can be no assurance that in some future case, if the particular wiretap authorization proved politically embarrassing, the Attorney General would not then repudiate his "Lindenbaum." The Attorney General would always be able to say with the benefit of hindsight that the subordinate had betrayed his confidence, acted beyond the scope of his responsibility, and the actions taken were not those of an agent. The alter ego theory destroys the concept of establishing identifiable individual responsibility at a certain level of government.
 
 D. Proliferation of Applications
 
 26
 The Government submits that the proliferation of wiretap applications has made the personal attention of the Attorney General to each case an impossibility. Therefore, it is urged that Mr. Lindenbaum properly could act for the Attorney General. But we are not dealing with the question of subdelegation in the abstract. Before us is a specific statute which says who can act in the place of the Attorney General. It is a long-recognized rule of statutory construction that the enumeration of certain things implies the exclusion of all others, expressio unius est exclusio alterius. "Generally speaking a 'legislative affirmative decription' implies denial of the non-described powers." Continental Casualty Co. v. United States, 314 U.S. 527, 533, 62 S.Ct. 393, 396, 86 L.Ed. 426 (1942). The congressional limitation here excludes any individuals not specifically enumerated in Sec. 2516 from the group who might properly authorize wiretap applications. Only the Attorney General or a specially designated Assistant Attorney General may authorize such applications.
 
 
 27
 Congress was not blind to the possible burden entailed in requiring the personal attention of the Attorney General in each and every wiretapping instance. Recognizing the ever-increasing responsibilities of the office, a safety valve was provided. The Attorney General might designate one or more of his Assistant Attorneys General to handle the burgeoning number of wiretap applications, to authorize them in his absence, or he might make designations on an ad hoc basis. Conceivably, the position of Assistant Attorney General in charge of all electronic surveillance could have been created. The Attorney General could choose any Assistant Attorney General to serve as his "alter ego" and could delegate his responsibility in the area under a variety of schemes; but he could not annoint his executive assistant to serve as his alter ego. Congress deliberately limited the Attorney General's range of choice. Under these circumstances, the Attorney General cannot claim that the burdens of his office made it necessary to permit his executive assistant to weigh the facts of a case and authorize wiretap applications without his personal knowledge.
 
 IV.
 
 28
 In his able opinion, 340 F.Supp. 1033 (D.Md.1972), Judge Miller traced the legislative history of Secs. 2518(1)(a)[5] and 2518(4)(d)[6] of Title III in addition to the history of Sec. 2516(1), and concluded that the statutory scheme sets up a two-step process. First, the application for a wiretap must be authorized in accordance with 2516(1)-by the Attorney General or a specially designated Assistant Attorney General. Second, the identity of the person authorizing the application must be made known to the judge acting on the application, and, ultimately, through the text of the judge's order, to all other interested parties. In Judge Miller's view the two steps are of equal importance in the legislative scheme. Consequently, he resolved the case without determining whether the wiretap application in this case was properly authorized-the basis of our decision today. Judge Miller granted the motion to suppress because the application to Judge Northrop and his subsequent order mistakenly stated that the authorizing party was Assistant Attorney General Will Wilson.
 
 
 29
 Most other courts[7] have followed another approach in deciding the issue of compliance with Secs. 2518(1)(a) and 2518(4)(d). These courts have said that once the Government has proved that Mitchell properly authorized the initial application, the fact that the Judge might have been told that Will Wilson rather than Mitchell was the source of the authorization was a matter of form, not substance. But here, there was no proper authorization at all. Neither Mitchell, nor Will Wilson-nor any Assistant Attorney General for that matter-authorized the Giordano wiretap application.
 
 
 30
 Perhaps it can plausibly be argued that when an application is properly authorized and only the identity of the source is mistakenly transmitted to the judge, he would have authorized the wiretap had he known the real facts. But where in the first place there is no proper authorization, this argument is unavailable. If Judge Northrop had been aware of the real status of the application, that neither Mitchell nor Wilson even knew of it, and that the application had been approved and initialed "JNM" by Lindenbaum, we are certain that he would have refused to permit the wiretap.
 
 
 31
 Acceptance of the government arguments would negate much of Title III. Section 2516 could be fulfilled by anyone; the Government could extend the alter ego argument apparently without limit. Section 2518(1)(a) (requiring that the judge be informed of the identity of the person authorizing the application) and section 2518(4)(d) (requiring the judge to state this information in his wiretap order) could be ignored. One is prompted to ask what would be left of the statutory scheme designed to protect the individual from potential governmental abuse-except the assurances of government officials themselves. We agree with Judge Becker, who stated in United States v. Narducci, 341 F.Supp. 1107, 1115 (E.D.Pa. 1972), that "the necessity for strict compliance with the statute in a wiretap situation stems just as much from the precedent-setting example of condoning laxity which could lead to further laxity in years to come, with serious consequences to personal liberties, as from concern over the rights of the accused in a given case."
 
 
 32
 To summarize: Congress enacted the various sections of Title III for a purpose. It wanted only specially designated persons of a certain stature within the Justice Department that the identity of the individual be transmitted to the authorizing magistrate so that he could be certain on whom he was relying; and it wanted the name of the authorizing individual stated in the judicial order so that interested parties might later be able to trace the line of responsibility. We cannot relegate provision after provision to oblivion by terming each a mere "technicality"-or else we leave the statute a shadow of itself, an apparition without substance.
 
 V
 
 33
 As a last resort, the Government submits that even if the authorization procedures used were deficient and the application and subsequent wiretap order irregular and misleading in some respects, "there is no reason to apply the drastic remedy of suppression to correct a technical defect in procedure." This is a beautiful example of the bootstrap technique. First the Government minimizes the violation of the various statutory provisions involved, characterizing them as "technical defects," and then in typical bootstrap fashion postulates that for minor violations there should be no sanctions. The defects in this case, however, go to the very heart of Title III. The statute imposes an overall ban on electronic surveillance except under certain circumstances pursuant to specific procedures-which are not mere technical steps along the way. Section 2515 of 18 U.S.C. then declares unequivocally:
 
 
 34
 Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial * * * before any court * * * if the disclosure of that information would be in violation of this chapter. (Emphasis added.)
 
 
 35
 The means to implement the sanction created by section 2515 is then provided by 18 U.S.C. Sec. 2518(10)(a), which directs that a motion to suppress shall be granted whenever 1) the communication was unlawfully intercepted; 2) the order of authorization or approval under which it was intercepted is insufficient on its face; or 3) the interception was not made in conformity with the order of authorization or approval. If the order had failed to identify the person who authorized the application, it would have been insufficient on its face, requiring suppression of the evidence. Here, however, there was no authorization at all, which is the equivalent of failing to identify anyone. Furthermore, the pattern of the Government's behavior in ignoring statutory requirement after statutory requirement necessarily leads to our determination that any communications derived from the wiretap were unlawfully intercepted and therefore properly suppressed.
 
 
 36
 It is appropriate here to recall Justice Brandeis' famous admonition given nearly forty-five years ago in Olmstead v. United States, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (dissenting), that when "government becomes a lawbreaker, it breeds contempt for law." Similarly, when government consistently tramples upon those parts of the law that do not suit its momentary purpose and seeks to justify its conduct by sophistic argumentation, neither respect for the law nor societal order is promoted. Accordingly, we affirm the order of the District Court suppressing the fruit of the wiretaps in these cases.
 
 
 37
 Affirmed.
 
 
 
 [1]
 Paragraph Two of the affidavit and application of Francis S. Brocato, Assistant United States Attorney for the District of Maryland, states:
 Pursuant to the power conferred upon him by Sec. 2516 of Title 18, United States Code, the Attorney General of the United States, the Honorable John N. Mitchell, has specially designated in this proceeding the Assistant Attorney General of the Criminal Division of the United States Department of Justice, the Honorable Will Wilson, to authorize affiant to make this application for an order authorizing the interception of wire communications. The letter of authorization signed by the Assistant Attorney General is attached to this application as Exhibit A.
 See note 2, infra.
 
 
 [2]
 The letter accompanying the Brocato affidavit, supra note 1, dated October 16, 1970, and purporting to bear the signature of Will Wilson, reads in pertinent part as follows:
 This is in regard to your request for authorization to make application pursuant to the provisions of Sec. 2518 of Title 18, United States Code, for an order of the court authorizing the Federal Bureau of Narcotics and Dangerous Drugs to intercept wire communications. * * *
 I have reviewed your request and the facts and circumstances detailed therein and have determined that probable cause exists to believe that Nicholas Giordina and others as yet unknown have committed, are committing, or are about to commit offenses. * * * I have further determined that there exists probable cause to believe that the above person makes use of the described facility in connection with those offenses, that wire communications concerning the offenses will be intercepted, and that normal investigative techniques reasonably appear to be unlikely to succed if tried.
 Accordingly, you are hereby authorized under the power specially delegated to me in this proceeding by the Attorney General of the United States, the Honorable John N. Mitchell, pursuant to the power conferred on him by Sec. 2516 of Title 18, United States Code, to make application to a judge of competent jurisdiction for an order of the court pursuant to Sec. 2518 of Title 18, United States Code, authorizing the Federal Bureau of Narcotics and Dangerous Drugs to intercept wire communications from the facility described above, for a period of 21 days.
 
 
 [3]
 When Mr. Brocato presented to Judge Northrop his affidavit and the Will Wilson letter upon which it was based, he believed the truth of the recitals therein contained. Later, the veracity of his submissions having been challenged, Brocato investigated the origins of the Wilson letter and represented to the court below that Mr. Will Wilson did not sign the Giordano application or almost any Title III application bearing Wilson's purported signature. He told Judge Miller that "Will Wilson made no determinations at any point, and it's very surprising if you find a letter which was signed by Will Wilson. In fact, we were trying to find out-I recall personally when we were trying to find out who signed the Will Wilson, and [someone] indicated maybe Will Wilson signed it, and everyone laughed." [Hearing February 8, 1972, Tr. 56.] The Government concedes that Will Wilson did not authorize the application and since the Attorney General never designated any Assistant Attorney General to authorize wiretap applications, which would have involved publication of the delegation in the Federal Register, only Attorney General Mitchell had the requisite authority to authorize the application. [Id. at 43.]
 
 
 [4]
 The facts presented are not novel. The same issue has been before several different courts under a variety of factual circumstances. The issue was resolved against the Government in United States v. Robinson (5 Cir. Jan. 12, 1972) (rehearing granted en banc July 21, 1972); United States v. Cihal, 336 F.Supp. 261 (W.D.Pa.1972), appeal docketed No. 72-1201 (3 Cir. April 13, 1972); United States v. Aquino, 338 F.Supp. 1080 (E.D. Mich.1972); United States v. Baldassari, 338 F.Supp. 904 (M.D.Pa.1972); United States v. Narducci, 341 F.Supp. 1107 (E.D.Pa.1972); United States v. Smith (N.D.Ill.1972); United States v. Mantello, (D.D.C.1972)
 The Government's position was upheld in United States v. Pisacano, 459 F.2d 259 (2 Cir. 1972). A subsequent panel of the Second Circuit wrote: "We feel bound to follow Pisacano, especially since it is so recent and the facts before the court there are indistinguishable * * *. Our adherence to the law of the circuit, as thus established, is not to be construed as an approval of the procedure followed by the Attorney General and his staff * * *." United States v. Becker, 461 F.2d 230, 235 (2 Cir. 1972). Lower court opinions accepting the Government's position have been United States v. King, Criminal Nos. 11627 and 11257 (no written opinion yet filed) (S.D.Cal. 1972); United States v. Gibson, Criminal No. 7672A (E.D.Va.1972) (no written opinion); and the United States v. Lawson, 347 F.Supp. 144 (E.D.Pa.1972).
 We have read these decisions carefully, and while this court is not bound by any of them, we do think that those holding against the Government are the better reasoned.
 
 
 [5]
 Title 18, Section 2518(1)(a), United States Code, requires:
 (1) Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:
 (a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application; * * *
 
 
 [6]
 Title 18, Section 2518(4)(d) states:
 (4) Each order authorizing or approving the interception of any wire or oral communication shall specify-
 (d) the identity of the agency authorized to intercept the communications, and of the person authorizing the application; * * *
 
 
 [7]
 See, e. g., United States v. LaGorga, 336 F.Supp. 190 (W.D.Pa.1971); United States v. Aquino, 336 F.Supp. 737 (E.D. Mich.1972); United States v. Doolittle, 341 F.Supp. 163 (M.D.Ga.1972); United States v. Gerodemos (N.D.Ind.1972); United States v. Iannelli, 339 F.Supp. 171 (W.D.Pa.1972); United States v. Cantor, 328 F.Supp. 561 (E.D.Pa.1972); United States v. D'Amatto, 340 F.Supp. 1020 (E.D.Pa.1972); United States v. Whitaker, 343 F.Supp. 358 (E.D.Pa. 1972). Contra United States v. Casale, 341 F.Supp. 374 (M.D.Pa.1972), reversed sub nom. United States v. Ceraso, 467 F.2d 647 (3 Cir. 1972)