**UNITED STATES of America,**
**Appellee,**

**v.**

**Pasquale SELLARO, Appellant.**

**No. 71–1719.**

United States Court of Appeals,
Eighth Circuit.

Submitted April 9, 1973.

Decided June 12, 1973.

Certiorari Denied June 9, 1975.
See 95 S.Ct. 2419.

Robert G. Duncan, Kansas City, Mo., for appellant.

Anthony P. Nugent, Asst. U. S. Atty., Kansas City, Mo., for appellee.

Before GIBSON, BRIGHT and ROSS, Circuit Judges.

GIBSON, Circuit Judge.

Pasquale Sellaro was convicted in a jury trial in the United States District Court for the Western District of Missouri for violation of 18 U.S.C. § 1952.[1] The indictment alleged that Sellaro had used an interstate facility, the telephone, in the violation of the laws of Missouri against bookmaking and gambling, specifically Mo.Rev.Stat. §§ 563.350 and 563.360, V.A.M.S.[2] The other count of

---

1. Section 1952 in part reads:
"Interstate and foreign travel or transportation in aid of racketeering enterprises.
"(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
"(1) distribute the proceeds of any unlawful activity; or
"(2) commit any crime of violence to further any unlawful activity; or
"(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
"(b) As used in this section 'unlawful activity' means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or controlled substances (as defined in section 102(6) of the Controlled Substances Act) or prostitution offenses in violation of the laws of the

State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

2. Mo.Rev.Stat. §§ 563.350 and 563.360, V.A.M.S. in part read:
563.350 Bookmaking and pool selling—penalty
"Any person who occupies any room, shed, tenement, tent, booth or building, or any part thereof, in this state, and who occupies the same with any book, instrument or device for the purpose of recording or registering bets or wagers or selling any pools upon the result of any trial or contest of skill, speed or power of endurance of man or beast which is to be made or to take place within or without this state; or any person who records or registers a bet or wager, or sells pools, upon the result of any trial or contest of skill, speed or power of endurance of man or beast which is to be made or to take place within or without this state or to register a bet on a horse race, either on a blackboard or any other substance, or to telephone a bet on a horse race to any other state to be registered there, or

which he was convicted charged that he conspired with others to violate § 1952, which in turn would be a violation of 18 U.S.C. § 371.

During the period, December 5, 1969, to December 19, 1969, the Government had a wiretap on the telephones of Robert Thompson and Paul Sere, co-conspirators and co-indictees of Sellaro. During that time the FBI intercepted over 800 calls dealing with betting and overheard wagers which totaled in excess of $69,000. Thompson and Sere were charged with substantially the same offenses as Sellaro, pleaded guilty and were serving their sentences at the time of Sellaro's trial. They testified as prosecution witnesses under a grant of immunity. They testified that they were partners in a bookmaking operation in Kansas City, Missouri, during the period alleged in the indictment. About their relationship with Sellaro they testified that they would get the "line"[3] on various sporting events, principally football and basketball games, from him and that they would make bets with him. These bets were "lay-off" bets[4] for them but they did not know if Sellaro knew that they were lay-off bets. During the period from the start of the wiretap to December 13, 1969, when Sellaro became unavailable for these activities due to his arrest on that date to begin service of a state sentence, the FBI intercepted about 40 calls between either Thompson or Sere and Sellaro of which 17 involved wagers in the total amount of $2,915.00. The rest of the calls concerned the line. Neither Thompson nor Sere made any payment to Sellaro for the line but they did indicate that the wagers were made as compensation for this information. They would have to pay a "lug"[5] to place these bets with Sellaro. Sere and Thompson testified that they knew the defendant as Otto Sellaro.

telegraph a bet for such purpose, or to use any other instrument or device to accomplish or register the bets . . . shall, on conviction, be adjudged guilty of a felony . . . . "

"563.360 Bookmaking and pool selling occupying room, penalty

"Any person who occupies any room, shed, tenement, tent, booth, building or enclosure, or any part thereof, in this state, with any book, sheet, blackboard, instrument or device or substance for the purpose of recording or registering bets or wagers or selling any pools upon the results of any trial or contest of skill, speed or power of endurance of man or beast, which is to be made or to take place within or without this state; or any person who occupies any room, shed, tenement, tent, booth, building or enclosure, or any part thereof, in this state with any telephone or telegraph instrument, or any apparatus or device of any kind whatsoever, for the purpose of communicating information to any place in this or any other state, for the purpose of there recording or registering bets or wagers or selling pools upon the result of any trial or contest of skill, speed or power of endurance of man or beast, which is to be made or to take place within or without this state, or any person who in this state records or registers a bet or wager or sells pools upon the result of any trial or contest of skill, speed or power of endurance of man or beast, which is to be made or to take place within or without this state . . . shall, on conviction, be adjudged guilty of a felony . . . . "

3. The "line" is the number of points to be added to the final score of one of the teams in a game in order to make the bets even money bets rather than giving odds on one team being the winner.

4. When a bookmaker has more bets with him on one particular team than he can afford to lose, he balances his books by betting on that team to win with another bookmaker. In that way he covers a portion of his potential losses by potential winnings from the other bookmaker.

5. The greatest portion of a bookmaker's profit comes not from the excess of winning bets over losing bets but from a service charge on losing bets made with him. A bettor risks losing $11 to win $10. In a perfect operation the bookmaker will have balanced his books and will have the same amount of winning bets as losing bets placed with him. Each loser will pay $11 and the winner will be paid $10. The result is a net to the bookmaker of 5 per cent of the total amount bet. This 10 per cent on the losing bets is called the "lug" or by other names depending on the section of the country in which the operation occurs according to the expert witness from the FBI.

The Government also called Charles Fisk as a witness. He testified that he lived in Topeka, Kansas, and that he made calls to a number in Kansas City, Missouri, and spoke to a person named Pat. He made wagers with Pat and received a line from him. A telephone company employee testified that their record showed that the telephone number which Fisk called was assigned to Pat Sellaro and was located at 4946 North Flora, Kansas City, Missouri. This was the same number used by Thompson and Sere to talk to the defendant.

On this appeal Sellaro has raised eight points. We examine each seriatim and affirm.

*The Reasonable Doubt Instruction:* The District Court in charging the jury and instructing on reasonable doubt included the following language: "Proof beyond a reasonable doubt is such as you would be willing to rely upon in the most important of your own affairs." Sellaro, relying on United States v. Dunmore, 446 F.2d 1214 (8th Cir. 1971), cert. denied, 404 U.S. 1041, 92 S.Ct. 726, 30 L.Ed.2d 734 (1972), contends that the court erred in phrasing the instruction in these terms rather than in terms of a kind of doubt which would make a person hesitate to act. It is true that this Court in *Dunmore* stated that the latter type of instruction was preferable but the case was not decided on that ground. 446 F.2d at 1222. Rather it held that failure to give the instruction was not plain error under Rule 30 Fed.R.Crim.P., which requires that,

"No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

■ Defendant's objection to the reasonable doubt instruction stated, "[W]e feel that the definition of reasonable doubt is not sufficient and does not properly direct the jury as to what a reasonable doubt is." This general objection is no more effective in preserving the instruction for appellate review than *Dunmore* where no objection at all was made; it runs afoul of the requirement of the rule which requires a distinct statement of the matter objected to as well as the requirement of a statement of the grounds upon which the objection rests. This objection included neither. While the objection went to the entire reasonable doubt instruction it is clear that only the previously quoted material from the charge was even arguably objectionable. Moreover, no grounds for the objection were stated nor was the District Court's attention directed to the recent *Dunmore* decision. We note also that counsel failed to offer to the District Court any other reasonable doubt instruction which would have in counsel's opinion, properly instructed the jury on reasonable doubt.

In Northcraft v. United States, 271 F.2d 184, 189–190 (8th Cir. 1959), this Court held that an objection which merely stated that the Court's instruction "does not correctly state the law" was not sufficient to preserve the alleged error for review. The instant case is not distinguishable from *Northcraft*.

We therefore, need not reach the issue of the propriety of the District Court's reasonable doubt instruction. The instruction is not reviewable under Rule 30.

*The Qualification of the Expert Witness:* The Government used an FBI agent as an expert witness for the purpose of informing the jury of the method of operation of bookmakers and to define various terms used by bookmakers in carrying out their operation. The Special Agent had attended three special schools conducted by the FBI for the purpose of studying gambling and related matters and had worked in the area for the FBI for eight years. The defense tried to show that he was not qualified to testify on these matters be-

cause none of the schools was taught by bookies and the agent had never placed a bet with a bookie.

 Qualification of expert witnesses is left to the discretion of the trial court. Matheson v. United States, 227 U.S. 540, 543, 33 S.Ct. 355, 57 L.Ed. 631 (1913); Hamilton v. Empire Gas & Fuel Co., 297 F. 422, 430 (8th Cir.), cert. denied, 266 U.S. 607, 45 S.Ct. 92, 69 L.Ed. 465 (1924). See also, II Wigmore on Evidence § 561 (3d Ed. 1940) (and cases cited therein). We find no abuse of discretion in the admission of the testimony of this expert.

 *The Violation of State Law:* The statute under which the substantive count was tried, § 1952, necessarily requires proof that the defendant was involved in an unlawful activity under state law. In this case the unlawful activity was bookmaking. We have previously set out the pertinent parts of the Missouri statutes under which this case was submitted to the jury.[6] The defendant alleges that the evidence was not sufficient to support the necessary finding by the jury that he was operating in violation of state law. Under Mo.Rev.Stat. § 563.350, V.A.M.S. the jury would have been required to find that the defendant had recorded bets or wagers. The particular Missouri statute and the cases decided under it by the state courts make it clear that it is the physical act of recording which the statute prohibits.[7] The first part of the statute requires that any person who occupies a room or building with any book, instrument or device for recording or registering wagers shall be guilty of a felony. In State v. Oldham, 200 Mo. 538, 98 S.W. 497 (1906), the defendants were found to be not in violation of this section where they operated a booth at a racetrack in Missouri and transmitted bets from the booth by telephone for recording outside the state. The next year the statute was amended by inserting, "or to register a bet on a horse race, either on a blackboard or any other

substance, or to telephone a bet on a horse race to any other state to be registered there. . . ." This phrase is very specific and was obviously designed to deal with the particular problem raised by *Oldham.* It does indicate that this statute is to be read narrowly.

 The Government contends that the proof of the volume of business which was done between Thompson and Sere and Sellaro gives rise to a permissible inference that he must have recorded the bets in some manner. We do not agree. Seventeen wagers in eight days is not too great a number to remember, and the Government had no proof of any other wagers for Sellaro during the period of time. Any finding by the jury that he had recorded the wagers would be based only on guesses and speculation.

 The second Missouri statute, § 563.360, under which the case was submitted is of greater help to the Government. It provides that it is unlawful to occupy a room or building with a telephone for the purpose of communicating *information to any place within or without* the state for the purpose of there recording or registering bets and wagers. There are no Missouri cases which would tell us whether the statute applies only to the transmission of an actual bet over the telephone to be recorded elsewhere or whether the statute is broad enough to include the transmission of the line information for the operation by the recipient of the business which includes the recording and registering of bets.

The answer to this question would seem to lie in the differences in the wording between § 563.350 and § 563.-360. A reading of the two statutes shows that they are remarkably similar and that many activities would be prohibited under both sections. However, § 563.350 makes it an offense to:

" . . . *telephone a bet on a horse race to any* other state to be registered there, or *telegraph a bet for*

6. See n. 2, *supra.*

7. See, e. g. State v. Oldham, 200 Mo. 538, 98 S.W. 497 (1906).

such purpose, or to use any other instrument or device to accomplish or register the bets . . . ." (emphasis added).

On the other hand § 563.360 is phrased in completely different terms. In this section the offense is to occupy,

". . . any room, shed, tenement, tent, booth, building or enclosure, or any part thereof, in this state with any telephone or telegraph instrument, or any apparatus or device of any kind whatsoever, *for the purpose of communicating information* to any place in this or any other state, for the purpose of there recording or registering bets or wagers or selling pools upon the result of any trial or contest of skill, speed or power of endurance of man or beast, which is to be made or take place within or without. this state . . . ." (emphasis added).

The use of the term "information" in § 563.360 is obviously intended to include a broader range of activities than merely the use of the telephone to relay bets to some other location. Had the legislature intended to so restrict the statute it could have done so in almost the same language employed in § 563.350. All of § 563.360 was adopted at the same session as the quoted portion of § 563.350 which was adopted as an amendment to a statute then in existence. The choice of language for each section would appear to be both deliberate and meaningful.

The term employed, information, is broad enough to include the activity of supplying line information to the other bookmakers, Thompson and Sere, for their use in registering and recording bets.

In Spinelli v. United States, 382 F.2d 871, 893 (8th Cir. 1967) (en banc), rev'd on other grounds, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), we held that furnishing a line might well be a necessarily included part of the business of accepting wagers and, though not specifically forbidden by the statute, constitute a facet of the broader prohibition against gambling. We take here only the short further step, which was not necessary to the resolution of *Spinelli,* to hold that the Missouri statute does prohibit the distribution of "lines" by means of telephones in this state.

The evidence conclusively shows that Sellaro was engaged in a bookmaking operation in violation of state law.

*The Interstate Facility*: Sellaro's next point is that the Government failed to prove that he had used or caused the use of wire communication facilities in interstate commerce. In support of this argument he cites Rewis v. United States, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971). This reliance is misplaced.

In *Rewis* the defendants operated a lottery in the northern part of Florida that was also patronized by persons who would travel from Georgia to gamble there. Thus the case was brought under the travel portion of § 1952. The charge was that the defendants had aided and abetted in the interstate travel. The Supreme Court held that where the illegal activity was wholly intrastate it could not be brought under the prohibitions of the federal statute by the sole fact that some of the customers had to travel in interstate commerce to patronize the establishment.

The instant case presents a completely different factual situation. Unlike *Rewis* where only the customers used the facilities of interstate commerce in their travels, the defendant in this case actually used the telephone in interstate commerce. The fact that the calls were instigated by the customer is not analogous in the *Rewis* situation where only the customer traveled in interstate commerce. Here the evidence showed that Sellaro used an interstate communications facility in his business.

The fact that the Government did not prove that the defendant had actual or constructive knowledge that the calls which he received were interstate calls does not immunize the defendant from the effects of the statute. The

statute contains no knowledge requirement. This issue was laid to rest in United States v. Hanon, 428 F.2d 101, 107–108 (8th Cir. 1970), cert. denied, 402 U.S. 952, 91 S.Ct. 1608, 29 L.Ed.2d 122 (1971), and is amply supported by the authorities cited in that case.

*The Conspiracy:* The law with regard to conspiracy is well settled.

"The offense of conspiracy consists of an agreement between the conspirators to commit an offense, attended by an act of one or more of the conspirators to effect the object of the conspiracy. United States v. Falcone, 311 U.S. 205, 210, 61 S.Ct. 204, 85 L. Ed. 128 (1940); Kirschbaum v. United States, 407 F.2d 562, 565 (8th Cir. 1969); Cave v. United States, 390 F. 2d 58, 69 (8th Cir. 1968), cert. denied, 392 U.S. 906, 88 S.Ct. 2059, 20 L.Ed. 2d 1365 (1968). In order to establish a conviction under 18 U.S.C.A. § 371, the government must prove (1) an agreement, (2) a combination of two or more persons, (3) an unlawful purpose, and (4) an overt act committed by one of the conspirators in furtherance of the conspiracy. Cross v. United States, 392 F.2d 360, 362 (8th Cir. 1968)." United States v. Skillman, 442 F.2d 542, 547 (8th Cir.), cert. denied, 404 U.S. 833, 92 S.Ct. 82, 30 L.Ed.2d 63 (1971).

The question presented here is whether the Government's evidence was sufficient to prove the crime of conspiracy. We must view the evidence in the light most favorable to the jury's verdict and accept as true and established all reasonable inferences that tend to support the jury's actions and conclusions. United States v. Skillman, *supra,* at 547 (and cases cited therein).

While the evidence in this case on a conspiracy is not strong, it is sufficient to support the jury's verdict. The most persuasive evidence of the conspiracy concerns a phone call made on December 11. Thompson and Sere testified that they got a line from Sellaro and from an individual named Robert

Weinman at the Rounder's Club, a private club in Kansas City, Kansas. On December 11, at 4:38 p. m., Sellaro called the basketball line to Thompson. He gave Thompson the college line and told him that he would give Thompson the "pro" line later. At 5:15 p. m. Thompson called Sellaro and Sellaro gave him the "pro" line. At that time Sellaro asked Thompson, "Yeah, you want to call that guy over there, Bob for me?" Thompson agreed and Sellaro said, "Give it to him, will you, tell him I'm eating right now." After hanging up, Thompson immediately called Weinman at the Rounder's Club and gave him the line which he had just received from Sellaro.

This sequence of events should give rise to the reasonable inference that the relationship between Sellaro and Thompson was more than that of a bookie-customer. A bookie would not be able to delegate duties in such a manner to a mere customer.

*Use of the Grand Jury:* Sellaro alleges that the Government improperly used the grand jury as a device for discovery and the intimidation of defendant's witnesses. Examining the factual background of this allegation we find that it is based on the fact that counsel for one of Sellaro's co-defendants, Sam Eddy, interviewed Thompson and Sere while they were incarcerated in the Federal Medical Center at Springfield, Missouri, and purportedly was informed by them that they would testify favorably on behalf of Eddy at the forthcoming trial. This information was communicated to the district attorney. Thompson and Sere were thereafter called before the grand jury and questioned about gambling activities. Sellaro alleges that the sole or dominating reason for calling them before the grand jury was to gather evidence for the trial or to intimidate them. The District Court made a factual finding that this was not the case, and found that the testimony was taken in connection with the investigation of the gambling activities of other persons.

We have examined the grand jury transcripts of these witnesses and believe that this finding was not clearly erroneous. While the practice of calling prospective witnesses before a grand jury is not commended, no impropriety was committed during this grand jury proceeding. Of course, a grand jury should not be used to prepare for a pending trial. Such abuse was specifically condemned in United States v. Dardi, 330 F.2d 316, 336 (2d Cir.), cert. denied 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed. 2d 50 (1964), and constitutes a misuse of the grand jury process. Thus a more propitious timing of grand jury appearances would obviate apprehension on the part of trial defendants and conserve court resources on considering time consuming objections. However, where the purpose of the grand jury proceeding is directed to other offenses, its scope cannot be narrowly circumscribed and any collateral fruits from bona fide inquiries may be utilized by the government. See United States v. Doe (Appl. of Ellsberg), 455 F.2d 1270 (1st Cir. 1972).

*The Wiretap Authorization*: Sellaro contends that the wiretap evidence should be suppressed and the conviction reversed because the Government failed to comply strictly with the wiretap provisions of the statute, 18 U.S.C. § 2518.[8] Evidence showing the processing of the application within the Department of Justice was presented by affidavit. The request for authorization was made by the Director of the FBI on November 5, 1969. The file and the proposed affidavit, application and order were first re-viewed by an attorney in the Organized Crime and Racketeering Section of the Justice Department. The documents were next reviewed by the Deputy Chief of the Organized Crime Section and then by the Chief. They were next forwarded to Henry E. Peterson, a Deputy Assistant Attorney General in the Criminal Division, who reviewed the file and forwarded it to the office of the Attorney General with a detailed recommendation that it be authorized. Attorney General Mitchell, by a memorandum which he personally initialed, specially designated Assistant Attorney General Will Wilson to authorize application for the wiretap. The file was returned to Peterson who signed Wilson's name to the letter of authorization. Will Wilson never saw the file or the letter of authorization. He had authorized Peterson to sign his name to these letters in cases where the application had been approved by the Attorney General. This was regarded by the Department as a ministerial act by Peterson and not an approval by Peterson.

Sellaro contends that this procedure runs afoul of the statutory requirement that the application for the wiretap order and the order itself must include the identity of "the officer authorizing the application." In this case the application was authorized by the Attorney General but the letter of authorization purported to be from Will Wilson, an Assistant Attorney General. The letter was in fact signed by Deputy Assistant Attorney General Peterson who was the one who had seen the file, and not Wilson.

---

8. The statute reads in pertinent part:
"§ 2518. Procedure for interception of wire or oral communications.
"(1) Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:
"(a) The identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;
* * * * *
"(4) Each order authorizing or approving the interception of any wire or oral communication shall specify—
* * * * *
"(d) the identity of the agency authorized to intercept the communications, and of the person authorizing the application . . . ."

This issue was before the Court in United States v. Cox, 462 F.2d 1293 (8th Cir. 1972), where this Court held:

"Because Mr. Mitchell did approve the application, it is unimportant that Mr. Wilson's ministerial act of sending a letter of approval to Mr. Hamilton was actually signed by Mr. Peterson, and it is irrelevant that the application and order recited the authorizing officer as Mr. Wilson rather than Mr. Mitchell. . . . The requirement in 18 U.S.C. § 2518 that the authorizing officer be named was designed to insure that decisions to wiretap were made by the named officials and did not reach into the lower echelons of command. That requirement should not be construed so inflexibly as to invalidate a wiretap application personally authorized by the Attorney General of the United States simply because the request recites the Assistant Attorney General as the applying officer." 462 F.2d at 1300.

*Accord,* see United States v. Ceraso, 467 F.2d 647 (3d Cir. 1972); United States v. Becker, 461 F.2d 230 (2d Cir. 1972). We are aware of the recent opinion of the Ninth Circuit in United States v. Chavez, 478 F.2d 512 (9th Cir. 1973), cert. granted, 412 U.S. 905, 93 S.Ct. 2292, 36 L.Ed.2d 969, holding on identical facts that the wiretap evidence must be suppressed. While we can agree with almost all of the observations of that Court with regard to the procedures followed by the Department of Justice in the authorization of applications for wiretap orders, we cannot agree that the statute requires the extraordinary sanction of suppression in cases involving the facts before this Court.

Although the Supreme Court has recently granted certiorari in a wiretap case, United States v. Giordano, 469 F. 2d 522 (4th Cir. 1972), cert. granted, 411 U.S. 905, 93 S.Ct. 1530, 36 L.Ed.2d 194 (1973), its facts are distinguishable from the case before us. In *Giordano* the Attorney General did not approve the application for the wiretap prior to its authorization; the approval was made by his administrative assistant, purportedly under guidelines established by the Attorney General. The case involves the question of an authorization without the approval of any individual named in § 2516 of the statute and is not based on § 2518 as is the case now before us. If there is to be a Supreme Court resolution between the conflicting holdings of *Chavez* and *Cox*, it will probably not be found in *Giordano* when that case is ultimately decided by the Court.

While we do not retreat from this circuit's position established in *Cox*, that technical deviations from the statutory scheme present in this case, as in *Cox*, will not result in suppression of the wiretap evidence, it would be of benefit to the prompt and efficient administration of justice if the procedures set out in the relevant statutes were more strictly observed. As of January 16, 1973, it was noted that:

". . . [Five circuit courts] and at least 13 district courts had delivered opinions dealing with the authorization procedures of the Department of Justice; that 13 additional unreported decisions of district courts were pending appeal in six circuits; and that the Department of Justice had informed the court that 92 cases were pending in 29 different district courts in which the issue of the authorization of wiretap applications had been raised." United States v. King, 478 F.2d 494 (9th Cir. 1973) (dissenting opinion of Judge Jameson, n. 3).

We are not unaware of the problems of time and administrative coordination in operating a large governmental department, but it hardly needs to be pointed out that a more conscientious adherence to the statutory procedures would have avoided the problems raised in this and similar cases involving wiretap authorizations and have escaped the condemnations set forth in *Chavez* and *Giordano*. *See, also,* United States v. Ceraso, 467 F.2d 647, 653 (3d Cir. 1972).

■ *Probable Cause*: Sellaro contends that the affidavit in support of the wiretap order did not establish probable cause and did not establish the reliability of the information contained therein. It recites that at least four persons have admitted to placing wagers with either Thompson or Sere over the telephone, two of whom were confidential informants. This is sufficient.

■ Sellaro contends that the reliability of the persons was not established by the affidavit. This Court has held that the statement of an eyewitness to a crime supplies its own indicia of reliability as a statement of facts rather than conclusions which must be tested to determine their factual basis. McCreary v. Sigler, 406 F.2d 1264, 1269 (8th Cir.), cert. denied, 395 U.S. 984, 81 S.Ct. 2149, 23 L.Ed.2d 773 (1969). Accord, United States v. Evans, 447 F.2d 129 (8th Cir. 1971); United States v. Mahler, 442 F.2d 1172 (9th Cir.), cert. denied, 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971). Moreover, rather than being regarded as eyewitnesses to an offense (which carries its own indicia of reliability), these informants can also be regarded as victims [9] of the crime and their information treated accordingly. United States v. Mahler, *supra*.

■ *The Scope of the Wiretap:* Finally Sellaro argues that the Government exceeded the scope of the wiretap order and that evidence obtained thereby was admitted to his prejudice. Both the application for the order and the order itself recited that the Government was authorized to intercept communications *from* the telephones belonging to Thompson and Sere. Sellaro contends that this did not authorize the interception of calls placed by others *to* these numbers. While the language used by the Government is imprecise, it is broad enough to encompass both incoming and outgoing calls from these telephones.

In summary, our review of the record and the briefs show that defendant received a full and fair trial while represented by able and knowledgeable counsel and that after a proper submission to the jury he was found guilty on both counts.

Judgment affirmed.

BRIGHT, Circuit Judge (dissenting).

I believe the wiretap evidence should be suppressed. Neither Attorney General Mitchell nor Will Wilson personally signed or initialed the authorization letter. This procedure did not accord with the statute, and the loose arrangement followed by the Department of Justice does not convince me that anyone in proper authority assumed the responsibility for engaging in wiretapping. For reasons enunciated in United States v. Chavez, 478 F.2d 512 (9th Cir. 1973), cert. granted, 412 U.S. 905, 93 S.Ct. 2292, 36 L.Ed.2d 969, I would reject this evidence.

The unrestrained use of wiretapping presents a grave potential danger undermining individual liberty and freedom. Current investigation into the Watergate incident underscores the aptness of Justice Clark's comments in Berger v. New York, 388 U.S. 41, 63, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), that "Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices." Congress has authorized wiretapping only within carefully circumscribed standards. The applicable statute provides for very limited authorization of wiretap applications by federal officers, *i. e.*, "The Attorney General, or any Assistant Attorney General specially designated by the Attorney General," 18 U.S.C. § 2516. The statute also requires identification of "the officer authorizing the application," 18 U.S.C. § 2518(1)(a).

I believe that because of the potential for abuse, Congress intended strict ad-

---

9. We are aware that the crime of gambling is classified as a "victimless" crime by many, however, if we must define the status of the informants in this case who admitted placing bets with Thompson and Sere we would have to place them in the same category as the victims of other crimes.

herence to all statutory provisions. Since such was not the case here, I would declare the wiretap illegal and the record of telephone conversations obtained thereby inadmissible.